IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
July 12, 2011 Session

**STATE OF TENNESSEE v. DAVID WEED**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 09-04872     James C. Beasley, Jr., Judge**

**No. W2010-01078-CCA-R3-CD  - Filed August 6, 2012**

Defendant, David Weed, was indicted by the Shelby County Grand Jury for two counts of official misconduct, a Class E felony. Defendant pleaded guilty to the offenses charged and was sentenced by the trial court to two years in the Shelby County Workhouse for each count, with all but 90 days suspended, after which Defendant would be placed on probation for five years. Defendant's sentences were ordered to be served concurrently. Defendant appeals his sentences and asserts that the trial court erred by denying his request for judicial diversion, or in the alternative, his request for full probation. After a careful review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3; Appeal as of Right; Judgments of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, PJ., and NORMA MCGEE OGLE, J., joined.

James E. Thomas, Memphis, Tennessee, for the appellant, David Weed.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; Amy P. Weirich, District Attorney General; Micheal A. Meyer, Deputy Attorney General, and William Bright, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

*Guilty plea submission hearing*

At the guilty plea hearing, the State summarized the facts underlying the offenses as follows:

[T]he defendant, a licensed attorney, was serving as a receiver for various types of receivership estates.

Some of these estates related to receivership proceedings that had been brought by the Commissioner of Commerce and Insurance against various insurance companies [that] had become insolvent or had otherwise violated state law.

In cases where the defendant was acting as a receiver in this capacity he was acting as a public official or public servant. Under the insurance laws[, the] Commissioner of Commerce and Insurance appointed him to serve as a special deputy receiver, and in that capacity acted on behalf of the Commissioner in the State of Tennessee.

The defendant also served as a court appointed receiver for Cherokee Children and Family Services, a non-profit public charity that had acted as a broker to provide daycare services for low income families. During the same period the defendant was appointed to serve as a receiver for various non-profit daycares that had operated in the Memphis area.

The defendant was acting as a public servant and an officer of the Court in the performance of those duties. Defendant was appointed to serve as a receiver after a Court had found the persons who had operated them, had abused their position of trust by converting daycare assets that had been placed in their care, and they had done that for a personal use.

In all the receiverships under his care the defendant had a duty to act in the best interest of the estates. Each of the receivership estates represented separate entities. Claims for each estate had to be paid from the assets of that particular estate and if the assets of an estate were not sufficient to pay fees and expenses the defendant could not use assets from another receivership to pay those claims that had been unsatisfied.

And any fees or expenses that the defendant earned or incurred for [a] receivership estate could only be paid out of the available funds for that receivership. The defendant did not have the permission of the Court, the Commissioner of the Department of Commerce and Insurance to use assets as I just described.

And furthermore there was no legal basis to use funds in that manner. . . . . while acting as a special deputy receiver, special deputy commissioner of the Department of Commerce and Insurance he took funds from a number of receiverships under his control and paid the expenses of three other receiverships, the receiverships for Children's Palace, Learning Academy, Creative Learning Day[c]are Center and Jack and Jill Day[c]are Center.

Included in the expenses was over $101,000 in fees that he paid to himself, and he paid those amounts without the knowledge or permission of the Commissioner of the Department of Commerce and Insurance.

After questions were raised about the amount of money that was in each of the receivership accounts the defendant transferred funds from Cherokee Children and Family Services in the amount of $89,900 back to the bank account that was under the insurance receivership control.

And all of these offenses would have been shown to have occurred in Shelby County.

*Sentencing hearing*

At the sentencing hearing, Defendant testified that "[t]here's no question about" his guilt of the offenses and that he "accept[ed] full responsibility for what happened and [was] very sorry that it did." Defendant testified that "[i]t could have been prevented if [he] had done [his] job correctly."

Defendant testified that he graduated from law school in 1974 and began working for the Tennessee Attorney General's office. In 1984, Defendant was appointed by the Commissioner of the Department of Commerce and Insurance to supervise receiverships for the State. In 1998, Defendant became the Director of the Tennessee Receiver's Office ("TRO").

Defendant explained that the State places an entity into a receivership when the entity can no longer pay its bills or there are claims of fraud or embezzlement against the entity. The receiver marshals the assets and evaluates and pays claims of the entity. In some instances, the entity continues to operate while its assets and claims are managed by the receiver; however, in cases where it is "clear from the beginning" that the entity cannot meet its financial obligations, it can be liquidated and dissolved.

-3-

In 2001, Defendant was appointed by the Attorney General's Office to supervise receiverships for several daycare centers. He testified that there were three separate checking accounts for each receivership: a payroll account, an operating account, and "a Memphis operating account." He also maintained an interest bearing "sweep account," in which he would deposit funds from other accounts until those funds were needed. Defendant testified that the daycare centers received "tens of thousands of dollars" every month from the State. Defendant testified that there was "never . . . enough money to pay [all the obligations of each daycare] one-hundred percent exactly on time. . . ." Defendant admitted that if there were insufficient funds to pay the obligations of a daycare, he withdrew money from another daycare's receivership account to pay them. Defendant testified, "[t]hat's what happened because I didn't do my job right." Defendant also testified, "I accept full responsibility for what happened." Defendant testified that he "didn't stay on top of the finances." He "had no [accounting] help" and that there were insufficient funds in the receiverships to pay for accounting services.

Defendant acknowledged that in February, 2006, he transferred $90,000, which Cherokee Children had collected from a settlement, from the Cherokee Children receivership account to an insurance receivership account to cover a shortfall. Defendant denied transferring the money because he was being investigated for the offenses for which he was convicted. Defendant testified that the Attorney General approved the transfer of funds.

Defendant testified that his fees were paid out of the receivership accounts. He was required to petition the court to authorize his fees. He testified that he was still owed $101,000 from the Jack and Jill Daycare Center. His payment for those fees was denied by the chancery court because he failed to provide the court a proper accounting.

Defendant testified that he was 61 years of age at the time of the sentencing hearing. His law license was suspended the prior year, and he had some health problems.

Mary Moody, Deputy Commissioner of the Tennessee Department of Commerce and Insurance ("the Department"), testified that between January, 2003, and March, 2007, she was General Counsel for the Department and supervised insurance receivership programs. She testified that the Department did not oversee daycare receiverships and she understood that the State Attorney General supervised those estates because they were non-profit entities. Ms. Moody testified that it is a receiver's duty to marshal the assets of the receivership and to pay the claimants of the receivership. She explained that receivers must submit detailed, verified statements of services performed in order to be paid fees out of the receivership estate. Bills for services rendered by receivers are reviewed by the Department's internal audit office for accuracy and reasonableness.

-4-

Ms. Moody testified that the Department would "absolutely not" authorize payment for a daycare receivership's expenses from an insurance receivership's estate. Ms. Moody testified that she was not familiar with the practice of depositing funds into a "sweep" account. She testified that with insurance companies in receivership, separate accounts are maintained for each estate, and the Commissioner is a signatory on each account because the Commissioner is the receiver and ultimately responsible for the funds.

She testified that she understood that the TRO was a private entity and not operating under the authority of the Department. Questions concerning Defendant's conduct were raised after she became aware that funds from several receiverships monitored by Defendant as deputy receiver were deposited into one master bank account. She and Commissioner Paula Flowers began investigating Defendant's conduct.

Paul Eggers, a CPA and Special Deputy for the Commissioner of the Department, further explained the duties of a receiver. Mr. Eggers testified that the assets of a receivership belong to the claimants of the estate. He testified that in "[n]o situation" would he transfer funds from one estate to pay the expenses of another unless he was ordered by a court to do so. In 2006, Mr. Eggers replaced Defendant as receiver for Petroleum Marketers Mutual Insurance Company. He requested from Defendant the company's books and records, and Defendant gave him a banker's box full of bank statements, and two-thirds of the statements had not been opened. In reconstructing the records, Mr. Eggers discovered approximately one half million dollars in uncashed checks to claimants. The value of the outstanding checks exceeded the balance of the checking account. When Mr. Eggers asked Defendant about the checks, Defendant stated that he did not have the resources to locate the claimants. Mr. Eggers determined that the account was insufficient by $200,000 to pay the claims authorized by the court. In reviewing the bank records, Mr. Eggers noticed other suspicious activity. In 2004, there were several cash withdrawals made using counter checks with no explanation as to the reason for the withdrawal. There were also transfers to accounts of which Mr. Eggers had no knowledge. Mr. Eggers compiled this information in a report that he gave to the Department. Mr. Eggers testified that he was familiar with a sweep account; however, he testified he "would never co-mingle funds from different receivership estates" into a sweep account.

Torry Grimes, a Special Investigations auditor for the Division of State Audit for the Comptroller Treasury, testified that he performed an investigative audit on the TRO. Mr. Grimes noted several transactions whereby funds were transferred from the TRO insurance receivership account to pay expenses of the daycare receiverships beginning in early 2005. Mr. Grimes determined that at the end of 2005, the daycare receiverships owed the TRO insurance account $270,149. Mr. Grimes testified that in February, 2006, after Mr. Eggers was appointed as receiver, a deposit was made into the TRO insurance claims account with

a check in the amount of $45,000 drawn on an account of Cherokee Children, and another deposit of $104,000 was made into the TRO account, of which $44,900 was from Cherokee Children, $42,800 and $13,900 from Jack and Jill, and $2,400 from Creative Learning. The deposits into the TRO account decreased the deficit in that account, or the amount owed to the daycare accounts. Mr. Grimes testified that over the course of a 17-month period, $101,983 was transferred to Defendant's personal account. Most of that money was transferred from the Children's Palace account.

The trial court found that Defendant had no prior criminal history. The trial court noted that the receivership accounts were negligently managed by Defendant, and as a result, substantially overdrawn; however, Defendant consistently paid himself from the receivership accounts for his fees. The trial court emphasized that Defendant had extensive experience in managing receiverships and stated:

> [I]f there's anybody, I would assume that we would call an expert in this field, it would be [Defendant] and, therefore, his statements and his testimony that he just got overwhelmed and this was just some mistakes I find hard to accept, and that's the troubling part of it.

> Because, again, I have a man who's sixty years old who has devoted his career to this type of a profession who gets caught up in a situation – arguably toward the end of his career – with this misconduct and that's the part of all this that's very disturbing to me.

In determining whether Defendant should have been placed on judicial diversion, the trial court found the following factors to weigh in Defendant's favor: 1) that Defendant was amenable to correction, 2) that Defendant had no prior criminal history, 3) Defendant's social history, and 4) Defendant's physical and mental health.

The court found that the circumstances of the offense weighed against judicial diversion in that Defendant's conduct was "[a] systematic course of misconduct over an extended period of time." The court also noted that because Defendant was in a position of public trust, denial of judicial diversion would have a deterrent effect and that it was in the public interest that Defendant be sentenced to confinement. The court found that Defendant "was given a responsibility based upon his reputation and his character and placed in a position of very high public trust, . . . and [Defendant] abused that trust." Finally, the court "was not overly impressed" with Defendant's testimony at the sentencing hearing and found him to be less than forthcoming and truthful in his explanation of his conduct.

The trial court considered statutory enhancement and mitigating factors and sentenced Defendant to two years confinement for each offense. His sentences were ordered to be served concurrently. Relying on the same factors the trial court considered in determining Defendant's candidacy for judicial diversion, the trial court also denied Defendant's request for full probation. In addition to those factors, the trial court also found that Defendant could reasonably be expected to be rehabilitated; that Defendant would abide by the terms of probation; that due to the suspension of Defendant's law license, it was unlikely that Defendant would be placed in another receiver position, and therefore, he did not pose a threat to society; and that a sentence of full probation would depreciate the seriousness of the offense.

The trial court ordered that Defendant serve 90 days in confinement with the remainder of his sentence suspended and that he be placed on probation for a period of five years. Defendant was also ordered to pay restitution in the amount of $101,900 at the rate of $100 per month.

*Analysis*

Defendant asserts that the trial court erred by denying his request for judicial diversion or, in the alternative, a sentence of full probation. Specifically, he argues that there is no substantial evidence in the record to support the trial court's decision. Defendant relies upon his lack of criminal history and amenability to correction to support his position that judicial diversion was appropriate in this case.

Before a trial court imposes a sentence upon a convicted criminal defendant, it must consider: (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing. Tenn. Code Ann. § 40-35-210(b); *see also State v. Imfeld*, 70 S.W.3d 698, 704 (Tenn. 2002). To facilitate appellate review, the trial court is required to place on the record its reasons for imposing the specific sentence, including the identification of the mitigating and enhancement factors found, the specific facts supporting each enhancement factor found, and the method by which the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. *See State v. Samuels*, 44 S.W.3d 489, 492 (Tenn. 2001).

Upon a challenge to the sentence imposed, this Court has a duty to conduct a *de novo* review of the sentence with a presumption that the determinations made by the trial court are correct. *See* Tenn. Code Ann. § 40-35-401(d). However, this presumption "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then the presumption is applicable, and we may not modify the sentence even if we would have preferred a different result. *See State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). We will uphold the sentence imposed by the trial court if (1) the sentence complies with the purposes and principles of the 1989 Sentencing Act and (2) the trial court's findings are adequately supported by the record. *See State v. Arnett*, 49 S.W.3d 250, 257 (Tenn. 2001). The burden of showing that a sentence is improper is upon the appealing party. *See* Tenn.Code Ann. § 40-35-401, Sentencing Commission Comments; *Arnett*, 49 S.W.3d at 257.

In the present case, it is evident from the record that, prior to imposing the Defendant's sentence of split confinement, the trial court considered Tennessee's sentencing principles and other relevant considerations set out above. Accordingly, the presumption of correctness regarding the trial court's sentencing determinations applies in this appeal. *See Ashby*, 823 S.W.2d at 169. For the reasons set forth below, we conclude that the trial court's denial of judicial diversion and full probation was not error.

A defendant who does not possess a criminal history showing a clear disregard for society's laws and morals, who has not failed past rehabilitation efforts, and who "is an especially mitigated or standard offender convicted of a Class C, D or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary." Tenn. Code Ann. § 40-35-102(6). The following considerations provide guidance regarding what constitutes "evidence to the contrary":

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant....

Tenn. Code Ann. § 40-35-103(1); *see also State v. Hooper*, 29 S .W.3d 1, 5 (Tenn. 2000).

Additionally, the principles of sentencing reflect that the sentence should be no greater than that deserved for the offense committed and should be the least severe measure necessary to achieve the purposes for which the sentence is imposed. Tenn. Code Ann. § 40-35-103(2), (4). The court should also consider the defendant's potential for rehabilitation or treatment in determining the appropriate sentence. Tenn. Code Ann. § 40-35-103(5). In this case, we point out that the Defendant did receive an alternative sentencing option; that is, he received a sentence of split confinement rather than total incarceration.

*Denial of judicial diversion*

A defendant may be granted judicial diversion when he or she is found or pleads guilty to a Class C, D, or E felony, has not previously been convicted of a felony or Class A misdemeanor, and is not being sentenced for certain sex offenses. Tenn. Code Ann. § 40-35-313(a)(1)(B). However, eligible defendants are not automatically entitled to judicial diversion. *See State v. Harris*, 953 S.W.2d 701, 705 (Tenn. Crim. App. 1996). The decision of whether to grant judicial diversion rests within the sound discretion of the trial court, and this Court will find an abuse of that discretion only if there is no substantial evidence supporting the denial of judicial diversion. *See Robinson*, 139 S.W.3d at 665 (citing *State v. Cutshaw*, 967 S.W.2d 332, 344 (Tenn. Crim. App. 1997)).

Our review of the record shows that the trial court set forth in detail the factors upon which it relied in denying judicial diversion. Those factors included Defendant's abuse of a position of public trust and what the court described as a "systematic course of misconduct over an extended period of time." The court also found that Defendant lacked candor with the court. Based on the presence of these factors supporting the trial court's decision, we must conclude that the trial court did not abuse its discretion in denying the Defendant judicial diversion. *See Robinson*, 139 S.W.3d at 665; *see also* Tenn. Code Ann. § 40-35-103(1)(B).

*Denial of full probation*

A defendant is eligible for probation if the actual sentence imposed upon the defendant is ten years or less and the offense for which the defendant is sentenced is not specifically excluded by statute. *See* Tenn. Code Ann. § 40-35-303(a). The trial court shall automatically consider probation as a sentencing alternative for eligible defendants; however, the defendant bears the burden of proving his or her suitability for probation. *See* Tenn. Code Ann. § 40-35-303(b). No criminal defendant is automatically entitled to probation as a matter of law. *See* Tenn. Code Ann. § 40-35-303(b), Sentencing Commission Comments;

*State v. Davis*, 940 S.W.2d 558, 559 (Tenn. 1997). Rather, the defendant must demonstrate that probation would serve the ends of justice and the best interests of both the public and the defendant. *See State v. Souder*, 105 S.W.3d 602, 607 (Tenn. Crim. App. 2002).

In determining whether to grant probation, the court must consider the nature and circumstances of the offense; the defendant's criminal record; his or her background and social history; his or her present condition, both physical and mental; the deterrent effect on the defendant; and the defendant's potential for rehabilitation or treatment. *See id.* If the court determines that a period of probation is appropriate, it shall sentence the defendant to a specific sentence but then suspend that sentence and place the defendant on supervised or unsupervised probation either immediately or after the service of a period of confinement. *See* Tenn. Code Ann. §§ 40-35-303(c), -306(a).

A defendant who is eligible for probation, as the Defendant is in this case, bears the burden of proving his or her suitability for full probation. *See* Tenn.Code Ann. § 40-35-303(b). In this case, the trial court found that the facts underlying the Defendant's crime were sufficient to justify a denial of full probation. In addition to the factors considered by the trial court in denying judicial diversion, the trial judge also determined that a sentence of full probation would depreciate the seriousness of the offense and that a sentence of confinement was necessary to provide an effective deterrent. The trial court stated:

> [T]he community and society tends to look to these particular positions when we place people in a position of trust, when the Courts rely on them, when law enforcement agencies rely on them, when the public relies on people based upon their experience, their training, their abilities.
>
> And then when those people get caught with their hand in the cookie jar for lack of a better way to describe it, the public looks to see how is the Court system going to view this.
>
> How, because this is a white collar crime, if you will. How, because this is somebody that's in a unique position. Do we treat them any differently?
>
> Well, to me because of the nature of this public trust that was placed in [Defendant], because there are other people involved in this type of business, and the amount of money involved is a very seriously large amount of money, and this Court feels that full probation would unduly depreciate the seriousness of this offense.

And, further, the Court finds that full probation would not provide an effective deterrent to others likely to commit this offense.

We conclude that the record supports the trial court's denial of full probation. Defendant is not entitled to relief.

## CONCLUSION

Finding no error in the record, we affirm the judgment of the trial court.

_____
THOMAS T. WOODALL, JUDGE